Turnbow *v.* Horn.

4-6294                                        149 S. W. 2d 560

Opinion delivered April 7, 1941.

*Garner & Crocker,* for appellant.
*Whitley & Utley,* for appellee.

SMITH, J. The Security Mortgage Company, a corporation, acquired title, on February 9, 1929, to south half of the northeast quarter of section 11, township 19 south, range 23 west, by foreclosure of a mortgage. This is the common source of title through which the opposing parties claim ownership.

On April 15, 1930, the mortgage company conveyed the land to John M. Stager; but this deed was not filed for record until February 3, 1938.

In August, 1930, which was subsequent to the date of the deed from the mortgage company to Stager, the mortgage company was adjudged a bankrupt, and on October 3, 1930, its trustee executed a deed to John Pullen, which was filed for record January 22, 1932.

On January 19, 1932, Pullen conveyed one-half of the mineral rights under this land to L. E. Allen and LaVonya Pullen, who later became Mrs. John K. Smith, after which deed Pullen executed a quitclaim deed to John M. Stager.

Numerous parties claim various interests by mesne conveyances from Allen and Mrs. Smith, which we do not deraign, for the reason, as was correctly found by the court below, that none of these deeds conveyed any interest in the land, this because the trustee, upon whose conveyance these claims rest, had no title to the land when he executed his deed to Pullen.

On December 4, 1937, appellant, R. N. Turnbow, a mineral lease and royalty broker, purchased a one-fourth interest in the minerals under the land from Horn and Mrs. King, who had obtained a deed for the entire interest from Stager, as well as a lease on the same, which interests were, on December 30, 1937, assigned to the Standard Oil Company of Louisiana by Turnbow. No one questions the validity of this transaction. Turnbow had an abstract of the title to this land, which he had checked against the records in the recorder's office, and it is not contended that he was not familiar with the title as it appeared of record. With this knowledge he negotiated with the claimants of what may be called the Pullen title which he acquired. Turnbow asserts the

superiority of this Pullen title, upon the ground that he was induced to buy it through representations of Dr. Horn that he (Horn) had already conveyed to Turnbow all the interest which he (Horn) owned in the land.

This suit was brought by Horn and Mrs. King to quiet their title against the Pullen claims, and from a decree awarding the relief prayed is this appeal.

For the reversal of this decree, Turnbow insists that Horn and Mrs. King are estopped by their conduct and representations from asserting any interest in addition to that which they had conveyed to him. This is purely a question of fact, and was decided adversely to Turnbow's contention, and that finding does not appear to be contrary to the preponderance of the evidence.

The various claimants to the Pullen title were made parties defendant; but none of them appealed from the decree quieting the title except Turnbow.

It appears unreasonable to us that Dr. Horn, with whom all the negotiations were conducted, should have stated that he owned no interest in the land except that which he had previously conveyed to Turnbow. Horn was aware that there was a cloud upon the title, and he had consulted an attorney, who had advised him that the cloud could be removed, although this was not done. Horn denied making any representation or statement to Turnbow which could have induced the belief that he and Mrs. King owned only the interest which they conveyed to Turnbow, and Turnbow's testimony to the contrary is somewhat equivocal. The case was heard on oral testimony, and during the trial the following questions were asked and answers given: "By the Court: Q. Mr. Turnbow, I don't understand from your testimony as to your conversation with Dr. Horn, whether you mean to say he conceded to you that you were only getting one-half interest in the minerals, or whether you and he recognized that deed was outstanding, and he recognized it was a cloud upon the title? A. We appreciated the fact that that interest was outstanding and I paid for the interest on the basis of a one-half interest. Q. And he conceded that to be true? A. It was my im-

pression he did. Q. Did you understand he conceded that, or did you just concede that yourself? A. At that time it was understood by all present, Dr. Horn, Miss McMorella and myself, that that interest was actually outstanding and that we were getting only one-half interest. That was what prompted the purchase of the royalty, to build up the cash consideration. I suppose you are familiar with the fact that it isn't the practice of the major companies to buy wildcat royalty. We wanted to build up the purchase price in order to get the lease interest. You may buy from a number of people to be sure you get the full interest. Q. But did he concede to you that he hadn't but one-half interest? A. It was discussed and agreed that he had only a half interest, and that was in the presence of the three of us.''

We think the answer above copied reading, ''We appreciated the fact that that interest was outstanding and I paid for the interest on the basis of a one-half interest,'' is significant, because it strongly corroborates the testimony of Dr. Horn. The effect of the admission is that the purchase price was based upon the fact that only a half interest was being conveyed, and that Dr. Horn and Mrs. King had an additional interest which they did not convey.

The finding of the court below that Dr. Horn and Mrs. King did not represent that they were conveying their entire interest does not appear to be contrary to the preponderance of the evidence, and as that finding is conclusive of this case, the decree must be affirmed, and it is so ordered.